Slip Op. 17-169

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BAODING MANTONG FINE CHEMISTRY CO., LTD.,**<br><br>             Plaintiff,<br><br>             v.<br><br>**UNITED STATES,**<br><br>             Defendant,<br><br>             and<br><br>**GEO SPECIALTY CHEMICALS, INC.,**<br><br>             Defendant-Intervenor. | **Before: Timothy C. Stanceu, Chief Judge**<br><br>**Court No. 12-00362** |

## OPINION

[Sustaining a decision responding to court order in litigation contesting a determination in a review of an antidumping duty order on glycine from the People's Republic of China]

                                                                             Dated: December 20, 2017

      *Ronald M. Wisla*, Fox Rothschild LLP, of Washington, D.C., for plaintiff Baoding Mantong Fine Chemistry Co., Ltd. With him on the brief was *Lizbeth R. Levinson*.

      *Antonia R. Soares*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., for defendant United States. With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr*., Assistant Director. Of counsel on the brief was *Christopher P. Hyner*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

      *David M. Schwartz*, Thompson Hine LLP, of Washington D.C., for defendant-intervenor GEO Specialty Chemicals, Inc.

      **Stanceu, Chief Judge:** In this action, plaintiff Baoding Mantong Fine Chemistry Co., Ltd.

("Baoding Mantong") challenged the determination issued by the International Trade

Administration, U.S. Department of Commerce ("Commerce" or the "Department") to conclude an administrative review of an antidumping duty order on glycine from the People's Republic of China. *Glycine from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 64,100 (Int'l Trade Admin. Oct. 18, 2012) ("*Final Results*"). The administrative review at issue pertained to entries of subject merchandise made during the period of March 1, 2010 through February 28, 2011. *Id*.

Before the court is the Department's decision submitted in response to the court's opinion and order in *Baoding Mantong Fine Chemistry Co. v. United States*, 41 CIT __, 222 F. Supp. 3d 1231 (2017) ("*Baoding Mantong II*"). *See Final Results of Redetermination Pursuant to Court Remand* (July 18, 2017), ECF No. 87-1 ("*Second Remand Redeterm.*"). The Second Remand Redetermination addresses the three remaining issues in this litigation. For the reasons that follow, the court will enter judgment sustaining the Second Remand Redetermination.

**I. BACKGROUND**

The background of this action is set forth in the court's two prior opinions, which are summarized and supplemented, as necessary, herein. *See Baoding Mantong Fine Chemistry Co. v. United States*, 39 CIT __, __, 113 F. Supp. 3d 1332, 1334-36 (2015) ("*Baoding Mantong I*"); *Baoding Mantong II*, 41 CIT at __, 222 F. Supp. 3d at 1234-37.

A. The Parties to this Litigation

Plaintiff Baoding Mantong is a Chinese producer and exporter of glycine. *Final Results*, 77 Fed. Reg. at 64,101. Baoding Mantong was the sole respondent in the administrative review at issue. *Id*. at 64,100. Defendant-intervenor GEO Specialty Chemicals, Inc. is a domestic producer of glycine and was a party to the administrative proceeding before Commerce. *Id*.

B.  Procedural History

Commerce issued the underlying antidumping duty order in 1995. *Antidumping Duty Order: Glycine From the People's Republic of China*, 60 Fed. Reg. 16,116 (Int'l Trade Admin. Mar. 29, 1995) (the "Order").  Commerce initiated the administrative review at issue in 2011. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 23,545 (Int'l Trade Admin. Apr. 27, 2011).  In the Final Results, Commerce assigned Baoding Mantong a weighted-average dumping margin of 453.79%.  *Final Results*, 77 Fed. Reg. at 64,101.  This margin was a calculated margin that did not result from the use of an adverse inference.

Before the court, plaintiff challenged the 453.79% dumping margin on various grounds. Mem. of P. & A. in Supp. of Pl.'s Rule 56.2 Mot. for J. on the Agency R. 2, 10, 13 (July 22, 2013), ECF No. 30-1 ("Pl.'s Br."); *see also* Rule 56.2 Mot. for J. on the Agency R. (July 22, 2013), ECF No. 30.  Plaintiff advanced a general argument that the margin was inaccurate, unfair, and inconsistent with commercial and economic reality, pointing out that during the administrative review it had reported that it did not suffer any financial loss on export sales during the period of review. *Baoding Mantong I*, 39 CIT at __, 113 F. Supp. 3d at 1339.  It also argued, specifically, that Commerce applied invalid surrogate values to four factors of production—for chlorine, liquid ammonia, formaldehyde, and steam coal—when calculating the normal value of Baoding Mantong's subject merchandise.  Pl.'s Br. 19-34.  Finally, plaintiff challenged the surrogate financial ratios Commerce used to value Baoding Mantong's factory overhead, selling, general, and administrative ("SG&A") expenses, and profit (collectively, the "financial ratios") for the normal value calculation. *Id*. at 34-39.  Noting the plaintiff had made a general challenge to the margin as well as specific challenges to surrogate value determinations, the court ordered Commerce to reconsider and redetermine "any and all aspects of the

Department's calculation of the 453.79% margin as necessary and appropriate" in arriving at a redetermined margin for Baoding Mantong. *Baoding Mantong I*, 39 CIT at __, 113 F. Supp. 3d at 1341.

Following the court's decision in *Baoding Mantong I*, Commerce submitted a redetermination ("First Remand Redetermination") that calculated a new dumping margin of 64.97%. *Baoding Mantong II*, 41 CIT at __, 222 F. Supp. 3d at 1234; *see also Final Results of Redetermination Pursuant to Court Remand* (Mar. 30, 2016), ECF No. 73-1 ("*First Remand Redeterm.*"). The reduction from the previous 453.79% margin to the new margin of 64.97% resulted from the Department's basing the financial ratios "upon the financial information for an Indonesian producer of urea, rather than the financial information of three Indonesian pharmaceutical companies," as it had in the Final Results. *Baoding Mantong II*, 41 CIT at __, 222 F. Supp. 3d at 1237 (quoting *First Remand Redeterm.* at 5).

Commerce submitted the First Remand Redetermination partially under protest. Having sought, through its counsel, a voluntary remand from the court in order to reconsider the financial ratios, Commerce stated that "respectfully, under protest, we have also reconsidered the remaining aspects of Baoding Mantong's normal value calculation." *First Remand Redeterm.* at 5. This included the four surrogate values that Baoding Mantong specifically challenged in its motion for judgment on the agency record, *i.e.*, chlorine, liquid ammonia, formaldehyde, and steam coal. *Id*. at 12-20. While protesting the obligation to do so, Commerce reconsidered its surrogate values for these and others of Baoding Mantong's production inputs. *Id*. at 12-26. It concluded that, as to each of these inputs, its surrogate values as determined in the Final Results were supported by substantial evidence and otherwise in accordance with law. *Id*. at 12-20.

In *Baoding Mantong II*, the court affirmed in part and remanded in part the First Remand Redetermination.  The court sustained the Department's new selection of information used to calculate the financial ratios and the Department's selection of a surrogate value for liquid chlorine.  *Baoding Mantong II*, 41 CIT at __, __, 222 F. Supp. 3d at 1240-45, 1247-48.  The court did not sustain the Department's determination of the surrogate values Commerce applied to Baoding Mantong's production inputs of ammonia, formaldehyde, and steam coal.  *Id*., 41 CIT at __, 222 F. Supp. 3d at 1248-54.  In the Second Remand Redetermination, Commerce redetermined each of these three surrogate values and used them in a recalculated weighted-average dumping margin for Baoding Mantong.  The result was a margin of 0.00%.  *Second Remand Redeterm.* at 16.

On August 17, 2017, Baoding Mantong filed comments in support of the Second Remand Redetermination, taking issue only with certain statements therein pertaining to the Department's reaching certain of its decisions under protest.  Baoding Mantong Fine Chemistry Co., Ltd.'s Comments on Commerce's Second Remand Results (Aug. 17, 2017), ECF No. 91 ("Pl.'s Comments on Second Remand").  Defendant-intervenor GEO Specialty Chemicals, Inc. did not file comments on the Second Remand Redetermination.  Defendant filed a response to Baoding Mantong's comments on the Second Remand Redetermination on August 28, 2017.  Def.'s Reply to Pl.'s Comments on the Remand Results (Aug. 28, 2017), ECF No. 92 ("Def.'s Response to Comments on Second Remand").  Both Baoding Mantong and defendant request that the court sustain the Department's Second Remand Redetermination.  *See* Pl.'s Comments on Second Remand 1, 3; Def.'s Response to Comments on Second Remand 1, 2.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), under which the court reviews actions commenced under section 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a.[1]  In reviewing an agency determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

### B.  The Redetermined Surrogate Values for Steam Coal, Ammonia, and Formaldehyde as Set Forth in the Second Remand Redetermination

In the Final Results, Commerce valued all of Baoding Mantong's production inputs using import data that it obtained from the Global Trade Atlas ("GTA").  For each production input, it chose import data from Indonesia, which is the country Commerce chose as its principal surrogate country.  The Department's regulations provide that "[e]xcept for labor, . . . the Secretary normally will value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2).  Because the regulation uses the word "normally," Commerce retained in the regulation the discretion to use data from more than one market-economy country in valuing the various factors of production.  Relevant to this point is that the statute contemplates situations in which Commerce may need to rely upon data from more than one surrogate country in order to fulfill its statutory obligation to value a factor of production according to the "best available information."  *See* 19 U.S.C. § 1677b(c) ("the valuation of the factors of production shall be

---

[1] All citations to the United States Code herein are to the 2012 edition and all citations to the Code of Federal Regulations herein are to the 2012 edition.

based on the best available information regarding the values of such factors in a market economy country *or countries* considered to be appropriate by the administering authority." (emphasis added)).  While the regulation expresses a preference for using information from only one surrogate country (except for the labor factor of production), the regulation cannot be read so broadly as to defeat the congressional directive that factors of production be valued according to the best available information.  The flexibility inherent in the word "normally" might be necessary in a case in which data in one surrogate country is the best available information for valuing only some, but not all, factors of production.  In other words, the comparability of data that results from having all surrogate values determined according to data in the same surrogate country, per 19 C.F.R. § 351.408(c)(2), is a consideration in deciding which surrogate data to use for a particular factor of production, but in light of the statutory directive of 19 U.S.C. § 1677b(c) to use the best available information from a surrogate country "or countries," it cannot be the sole consideration.  By using those words, the provision allows for instances in which data in the country Commerce otherwise might choose as its single surrogate country poses a significant problem for a particular factor of production.  This is such a case, for as the court noted in *Baoding Mantong II*, there was a significant problem with the Indonesian GTA import data Commerce used to value Baoding Mantong's use of steam coal in the Final Results and again in the First Remand Redetermination.

1.  Surrogate Value for Steam Coal

The court ruled that the Department's finding that the Indonesian GTA import data relevant to steam coal met the "best available information" standard was not supported by substantial evidence.  *Baoding Mantong II*, 41 CIT at __, 222 F. Supp. 3d at 1253-54.  The court agreed with Baoding Mantong's position that the average unit value ("AUV") Commerce

obtained from those data, $0.66 per kilogram, was disproportionately high relative to the AUVs obtained from other GTA import value information on the record, which pertained to Thailand and the Philippines (each with an AUV of $0.05 per kilogram), Ukraine (AUV of $0.20 per kilogram), and South Africa (AUV of $0.21 per kilogram). *Id*. Moreover, the quantity upon which the Indonesian AUV was based (less than 604 metric tons) did not compare favorably with the other quantity data (Thailand, 954,648 metric tons; Ukraine, 638,189 metric tons; South Africa, 234,389 metric tons; the Philippines, 15,920 metric tons[2]) and was less than Baoding Mantong's own consumption of 1,037 metric tons. *Id*. Commerce itself had acknowledged that Indonesia had GTA data with the lowest import volume and the highest value among the economically comparable countries. *Id*. (citing *First Remand Redeterm.* at 19). In support of its decision to continue to use the Indonesian data, Commerce explained that "it is the Department's practice to value all factors from a single surrogate country." *First Remand Redeterm.* at 19.

In the Second Remand Redetermination, Commerce valued the steam coal input using the GTA import data from Thailand, calculating a value of $0.05 per kilogram, noting that the data from Thailand represented the largest quantity of the four countries considered. *Second Remand Redeterm.* at 14. Commerce found that "the Thai data are the most representative of a broad-market average, as well as being product-specific, publicly available, contemporaneous with the period of review, and exclusive of taxes and duties." *Id*. These findings are supported by substantial evidence on the record.

Commerce concluded by stating that "pursuant to section 773(c)(1) of the Act, we respectfully under protest, find that the *GTA* import data from Thailand constitute the best

---

[2] *Baoding Mantong II* erroneously stated the quantity as 15,919,558 metric tons rather than 15,919,558 kilograms.

available information on the record and that the value of $0.05 per kilogram, which is based on these data, should be selected as the surrogate value for steam coal." *Id*. at 15. Commerce did not explain the reason for its protest. Despite the significant deficiencies the court had identified in the Indonesian GTA import data on steam coal, Commerce did not provide a specific basis for its apparent belief that the court had erred in ruling that Commerce lacked evidentiary support for its finding that these data were the best available information on the record. Instead, Commerce offered the general statement that "we continue to find that the most appropriate surrogate country for this review is Indonesia, pursuant to section 773(c)(4) of the Act [19 U.S.C. § 1677b(c)(4)]." *Id*. at 5. This general statement applied to all surrogate value determinations discussed in the Second Remand Redetermination and was not specific to the issue of the steam coal surrogate value.

### 2. Surrogate Value for Ammonia

In the Final Results and again in the First Remand Redetermination, Commerce chose, as the best available information for valuing Baoding Mantong's ammonia production input, import data for Indonesian HTS subheading 2814.20 (obtained from the GTA), which pertained to ammonia in aqueous solution, *i.e.*, aqueous ammonia. *First Remand Redeterm.* at 14-17. From those data, Commerce calculated a surrogate value of $4.06 per kilogram for Baoding Mantong's ammonia input in the Final Results and adhered to that determination in the First Remand Redetermination. *Id*. at 17. Before the court, Baoding Mantong argued that the "liquid ammonia" input it used in producing glycine was anhydrous ammonia, not aqueous ammonia as Commerce had found. Pl.'s Br. 23-28.

The court directed Commerce to reconsider its finding that the production input was aqueous ammonia. *Baoding Mantong II*, 41 CIT at __, 222 F. Supp. 3d at 1248-52. After noting

that the record contained conflicting evidence on the question of the identity of the input, the opinion stated that "the court cannot conclude from the Department's discussion and the record information that Commerce correctly made its decision based on substantial record evidence." *Id.*, 41 CIT at __, 222 F. Supp. 3d at 1250. "The court does *not* conclude that the finding that the production input was aqueous ammonia necessarily was incorrect as a factual matter, but in light of the deficiencies in the Department's explanation, the court directs Commerce to review the relevant record evidence and reach a well-reasoned and adequately explained finding as to what the input actually was." *Id.*, 41 CIT at __, 222 F. Supp. 3d at 1251.

During the second remand proceeding, Commerce issued a supplemental questionnaire to Baoding Mantong on the type of ammonia used in its production of glycine during the period of review. *Second Remand Redeterm.* at 8. Baoding Mantong submitted a response, along with certificates of analysis for its ammonia purchases indicating that the liquid ammonia Baoding Mantong purchased was a gas at room temperature and was sold commercially as a compressed liquid under pressure and refrigeration (*i.e.*, anhydrous), rather than a liquid at room temperature (*i.e.*, aqueous). *Id.* at 8-9. In the Second Remand Redetermination, Commerce determined that the input at issue in fact was anhydrous ammonia, a finding supported by the record evidence as supplemented by the questionnaire response. *Second Remand Redeterm.* at 5-10. Commerce did not reach this decision under protest.

Commerce then considered the record data relevant to valuation of liquid ammonia. In specific reference to the ammonia surrogate value, Commerce explained its criteria as follows: "in selecting a surrogate value and pursuant to 19 CFR 351.408(c)(1) and (2), the Department normally will utilize publicly available information and will normally value all factors of production from a single surrogate country." *Second Remand Redeterm.* at 10. "In addition, it is

the Department's practice to select values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and exclusive of taxes and duties." *Id*. The record contained GTA import data for anhydrous ammonia from the Philippines, Indonesia, Ukraine, Thailand, Colombia, and South Africa. *See id*. Commerce concluded that the value data on anhydrous ammonia from all six countries were specific to the input, publicly available, contemporaneous with the period of review, and exclusive of taxes and duties. *Id*. Commerce also found that the data were not all equal when viewed according to the criterion of being representative of a broad market average. *Id*. at 11. Commerce chose, on that basis, the GTA import data for Thailand, observing that "[a]lthough the volume of Indonesian imports of anhydrous ammonia is greater than the import volumes for four other potential surrogate countries, it represents only slightly more than half the import volume for Thailand." *Id*. Commerce further stated that "[t]hus, there is nothing to suggest, either nominally or comparatively, that the volume of Indonesian imports of anhydrous ammonia is commercially insignificant" but also stated that "[h]owever, as the volume of Thai imports was much greater, it may be found to be superior and, consequently, the most representative of a broad-market average." *Id*. Substantial evidence of record supports the choice of the Thai data and the surrogate value Commerce obtained from them.

Commerce further explained that it was influenced to choose the GTA data for Thailand over those of Indonesia because of the court's opinion in *Baoding Mantong II*, stating that "it remains our preference, consistent with 19 CFR 351.408(c)(2), to select all values from the primary surrogate country" and that "it is respectfully under protest that we find, pursuant to section 773(c)(1) of the Act [19 U.S.C. § 1677(c)(1)], the Thai *GTA* import data to constitute the best available information on the record and that we select the value of $0.45 per kilogram, based

on these data, as the surrogate value for anhydrous ammonia." *Id*. To support its statement that it was making its decision under protest, Commerce cited language in *Baoding Mantong II* related to the GTA data for aqueous ammonia. *Id*. According to Commerce, "[i]n *Baoding Mantong II*, the Court found that the Indonesian *GTA* import data for aqueous ammonia were not the data that were most representative of a broad-market average, particularly when compared to the import data for the Philippines." *Id*. This characterization of the court's opinion in *Baoding Mantong II* is not entirely correct.

In *Baoding Mantong II*, the court did not reach any conclusion as to the quantities in the GTA import data on *anhydrous* ammonia; instead, the discussion pertained to the GTA data on *aqueous* ammonia. Nor, as to those data, did the court *find* that the Indonesian GTA import data for aqueous ammonia were not the most representative of a broad market average. It is not the role of the court to make findings. Instead, the court pointed out that Commerce, in the First Remand Redetermination, failed to respond to Baoding Mantong's comment that the quantity of Indonesian aqueous ammonia relied upon by Commerce, 82 metric tons, was too small to serve as the basis for a surrogate value, especially when viewed against Baoding Mantong's own liquid ammonia consumption of 660 metric tons during the period of review. *Baoding Mantong II*, 41 CIT at __, 222 F. Supp. 3d at 1251. The court further discussed the issue as follows:

> In the Remand Redetermination, Commerce mentioned the quantity of 82 metric tons for Indonesian imports of aqueous ammonia but did not address the question of whether this quantity is commercially significant or why the Philippine data, which are based on a much larger quantity, would not be superior in that respect. *[First] Remand Redeterm.* at 17. Instead of addressing the question of quantity, Commerce discussed the question of whether the value was aberrational, concluding that it was not because "Indonesia's AUV is 4.06 USD/kilogram, which falls within the range of economic[ally] comparable countries of 0.28 to 6.94 USD/kilogram." *Id*. Commerce does not address the point Baoding Mantong raised concerning the relatively low quantities upon which all of the GTA data were based other than the data from the Philippines. Commerce concluded that "[t]he GTA data from Indonesia is representative of a

> broad market-average of liquid ammonia that is specific to this product HTS code," *id*. at 16, but does not explain in the [First] Remand Redetermination why the Philippine GTA data, which is based on 52,304 metric tons as compared to 82 metric tons for Indonesia, would not reflect a much broader market average. Although Commerce prefers using data from a single surrogate country, *see* 19 C.F.R. § 351.408(c)(2), choosing the Indonesian data over the Philippine data, which were based on a substantially larger quantity, raises a question as to whether the Indonesian data were the "best available information" as required by 19 U.S.C. § 1677b(c)(1).

*Id*., 41 CIT at __, 222 F. Supp. 3d at 1251-52 (second and third alterations in original). As to the issue of relative quantities and commercial insignificance, the court pointed out that Commerce failed to address the objections Baoding Mantong specifically had raised. The court, moreover, specifically recognized the Department's competing considerations of preferring a broad market average and also preferring to use surrogate values from a single surrogate country. In making its decision under protest, Commerce suggests that the Indonesian GTA import data on anhydrous ammonia were superior to the Thai GTA import data because they pertain to Indonesia, the chosen surrogate country, and, therefore, are the best available information for purposes of 19 U.S.C. § 1677(c)(1). Commerce implies that it chose the Thai data over the Indonesian data only because of the court's discussion regarding data on aqueous ammonia. But the court's prior opinion and order did not compel Commerce to choose the Thai data to value the anhydrous ammonia production input.

### 3. Surrogate Value for Formaldehyde

In the Final Results and again in the First Remand Redetermination, Commerce chose, as the best available information for valuing Baoding Mantong's formaldehyde input, GTA data for Indonesian imports under HTS subheading 2912.11(Methanal (formaldehyde)). *First Remand Redeterm.* at 17-18. Based on these data, Commerce calculated a surrogate value of $0.49 per kilogram. *Id*. In challenging this surrogate value, Baoding Mantong had argued that the quantity

of Indonesian imports on which the value was based, just over 357 metric tons, was not a commercially and statistically significant quantity. *See Baoding Mantong II*, 41 CIT at __, 222 F. Supp. 3d at 1252. Baoding Mantong advocated that Commerce use the GTA import data for the Philippines, which Baoding Mantong argued would support a surrogate value of $0.27 per kilogram based on a quantity of 6,025 metric tons. *Id*.

In *Baoding Mantong II*, the court did not hold that the 357 metric ton quantity was commercially insignificant. The court did agree with Baoding Mantong that the quantities in the GTA data set for Colombia (3 metric tons) and South Africa (828 kilograms, or approximately 0.8 metric tons) were aberrantly low when compared to the GTA data of record for the other economically comparable countries. *Id*. The court also noted that the AUVs for Colombia ($5.64 per kilogram) and South Africa ($23.54 per kilogram) were aberrational when compared to the AUVs for the other four countries, each of which showed AUVs of less than $1.00 per kilogram. *Id*. The court then opined that "the Indonesian data showed the smallest quantity of the four data sets that actually merited consideration," *i.e.*, the data sets for the Philippines, Thailand, Ukraine, and Indonesia.[3] *Id*., 41 CIT at __, 222 F. Supp. 3d at 1253. The court directed Commerce to explain "why the Philippine data would have been, or would not have been, a better source of information than the Indonesian data for valuing formaldehyde." *Id*. "The explanation must consider the record data as a whole, including the data showing that the quantity for the Philippine data was substantially higher than those for the other countries (and

---

[3] The quantities and average unit values for the four countries were as follows: the Philippines, 6,025 metric tons and $0.27 per kilogram; Thailand, 791 metric tons and $0.32 per kilogram; Ukraine, 493 metric tons and $0.90 per kilogram; Indonesia, 357 metric tons and $0.49 per kilogram. *Baoding Mantong's Submission of Surrogate Value Information and Comment* Attach. 3 (July 16, 2012), (P.R. Doc. 99).

between seven and eight times higher than the next largest quantity, which was the quantity for Thailand)." *Id*. The court added that "[t]he huge disparity between the Philippine quantity and the quantities for the other three countries that merited consideration must be considered in light of the Department's stated preference for using data that represent a broad market average." *Id*.

Commerce, under protest, chose the GTA import data for the Philippines as the best available information on the record for valuing formaldehyde, calculating a surrogate value of $0.27 per kilogram. *Second Remand Redeterm.* at 13. ("we find that the Philippine data are the most representative of a broad-market average, as well as being product-specific, publicly available, contemporaneous with the period of review, and exclusive of taxes and duties."). Substantial record evidence supports this decision, including the record evidence that these data were superior according to the "broad market average" criterion, having been derived from the largest quantity among the data sets. Commerce further explained that "[b]ecause use of these data is against the Department's preference for selections from a single surrogate country, we respectfully under protest find that, pursuant to section 773(c)(1) of the Act [19 U.S.C. § 1677b(c)(1)], the Philippine *GTA* import data constitute the best available information on the record and that the value of $0.27 per kilogram, which is based on these data, should be selected as the surrogate value for formaldehyde." *Id*.

The rationale for the Department's protest presumes that the court *required* Commerce to reject the Indonesian GTA data. In fact, the court *questioned* whether the Indonesian data were the best available information on the record and required an *explanation* for why the Philippine GTA import data, which are based on a much larger quantity than any other GTA data set on the record, would, or would not, be superior. *Baoding Mantong II*, 41 CIT at __, 222 F. Supp. 3d at 1253. The Department's preference for a single surrogate country is the only consideration in

favor of the Indonesian data, and the premise of the Department's rationale for reaching its decision under protest is that this preference outweighs the superiority of the Philippine GTA import data when viewed according to the Department's "broad market average" criterion. On that issue, the court also opined that Commerce will be required to use data other than Indonesian import data when valuing steam coal and that "[d]eparture from the single surrogate country practice thus will be required in any event, which reduces, if not defeats, the relevance of the preference reflected in 19 C.F.R. § 351.408(c)(2)." *Id*.

### III. CONCLUSION

As discussed above, the court's opinion and order in *Baoding Mantong II* affirmed the Department's choice of information for the calculation of financial ratios, affirmed the Department's surrogate value for liquid chlorine, found unsupported by substantial evidence the Department's surrogate value for steam coal, directed Commerce to reconsider whether, and reach a well-reasoned and adequately explained finding as to whether, the ammonia input was aqueous or anhydrous ammonia, and, in light of the need to use data other than the Indonesian GTA data to value steam coal, directed Commerce to explain why the Indonesian GTA data it used to value formaldehyde was, or was not, the best available information in light of the substantially greater quantity shown in the Philippine GTA data.

Commerce responded to the court's directive by making several new findings in the Second Remand Redetermination. Commerce found that the GTA data from Thailand for steam coal were the best available information because they were based on the largest quantity among the data sets. Commerce stated that it was doing so under protest but stated no specific rationale for its protest. Commerce found, but not under protest, that the ammonia production input was anhydrous ammonia and not aqueous ammonia. Commerce valued the anhydrous ammonia

according to GTA import data for Thailand, stating that it was doing so under protest, even though the court had not required Commerce to choose these data.  Finally, Commerce valued formaldehyde according to GTA import data from the Philippines, protesting on the inaccurate premise that the court had required Commerce to depart from its preference for valuing factors of production in a single surrogate country.

        As discussed above, the court does not agree with all of the statements Commerce made in the Second Remand Redetermination.  Specifically, the court has identified certain shortcomings in the grounds, or lack thereof, for the Department's reaching some decisions in the Second Remand Redetermination under protest, but the court does not consider these shortcomings to necessitate or justify another remand.  The decisions Commerce reached in the Second Remand Redetermination are supported by record evidence for the reasons the court has discussed in this Opinion.  Plaintiff Baoding Mantong supports the findings, and the ultimate conclusion, Commerce reached in the Second Remand Redetermination, and defendant-intervenor GEO Specialty Chemicals, Inc. has waived any objection by declining to submit comments on the Second Remand Redetermination to the court. Therefore, the court sustains the Second Remand Redetermination.  Judgment will enter accordingly.

                                            /s/Timothy C. Stanceu
                                          Timothy C. Stanceu, Chief Judge

Dated:  December 20, 2017
       New York, New York